UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOHN R. CUTCLIFFE d/b/a            )
CUTCLIFFE CONSULTING,             )
                                   )
      Plaintiff                   )
                                   )
v.                                 )   1:12-cv-00193-DBH
                                   )
UNIVERSITY OF ULSTER,              )
                                   )
      Defendant                   )

**RECOMMENDED DECISION**

The claims in this case are based on allegations that defendant University of Ulster,

which is a public university in Northern Ireland, failed to pay plaintiff John R. Cutcliffe for his

role in collaborating with the University[1] to create a distance-learning program that the

University ultimately decided not to offer, and that the University misappropriated Cutcliffe's

intellectual property.  (Complaint at 2-4, ECF No. 1.)  The University filed a motion to dismiss

the complaint, pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction.  (Motion,

ECF No. 11.)   Following my order for further briefing (ECF No. 20), the parties have also

addressed whether the University is immune from this lawsuit, pursuant to the Foreign Sovereign

Immunities Act (FSIA), 28 U.S.C. §§ 1602-1611, and the action must be dismissed, pursuant to

Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction.[2]

      I recommend that the Court hold that (1) the FSIA applies to the jurisdictional questions

presented by the motion to dismiss and (2) the Court does not have subject matter jurisdiction

over the action or personal jurisdiction over the University.  My recommendation is based on my

---

[1]      Unless otherwise indicated, references to "the University" refer to defendant University of Ulster.

[2]      Because it involves subject matter jurisdiction, the issue of jurisdictional immunity from suit under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611, may be raised sua sponte.  Walters v. Ind. and Comm. Bank of China, Ltd., 651 F.3d 280, 287 (2d Cir. 2011) (citing Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 n.20 (1983)).

conclusion that the University is an agency or instrumentality of the foreign state of the United

Kingdom, and although the activities at issue are commercial in nature, Cutcliffe has failed to

meet the other requirements to come within the commercial-activity exception to sovereign

immunity, pursuant to subsection 1605(a)(2) of the FSIA.  However, if the Court concludes that

the University is not an agency or instrumentality of a foreign state and the FSIA therefore does

not apply, it will need to address whether the University's contacts with the State of Maine

satisfy due process.  I conclude that personal jurisdiction is lacking under traditional minimum-

contacts analysis, based on insufficient contacts between the University and the State of Maine.

## I.      Background

### A.  Facts Relevant to the FSIA

The University challenges the legal sufficiency of Cutcliffe's assertions relevant to the

FSIA defense, and although the parties have factual disputes relevant to the issue of the

University's contacts with the State of Maine after he moved here from Texas, those disputes do

not bear upon the FSIA analysis.  (University's FSIA Brief, ECF No. 24; University's FSIA

Response, ECF No. 25.)  See 28 U.S.C. § 1330; Frontera Resources Azerbaijan Corp. v. State

Oil Co. of the Azerbaijan Republic, 582 F.3d 393, 398-400 (2d Cir. 2009).  I therefore accept the

facts as alleged by Cutcliffe, for purposes of the FSIA analysis.  See Robinson v. Gov't of

Malaysia, 269 F.3d 133, 140 (2d Cir. 2001) ("If the defendant challenges only the legal

sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the

complaint as true and draw all reasonable inferences in favor of the plaintiff.") (quotation marks

and citation omitted); Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir.

2000).  Those facts can be summarized as follows:

The following are the relevant background facts about the University: it is one of three public universities in Northern Ireland and was founded as an educational charity to advance education for the benefit of Northern Ireland and beyond; it is a legal entity that may contract, own property, and engage in litigation in its own name; it and the two other public universities in Northern Ireland hold exclusive rights to confer university-level degrees in Northern Ireland; it is supervised by the government in that it is obligated to make annual financial reports to the government and higher education authorities; and approximately seventy-five percent of its direct funding comes from the government, which subsidizes tuition for all students. (Mullan Declaration at 1-2, ECF No. 24-1.)

At times relevant to the University's motion, Cutcliffe was employed by the University of Maine, in Orono, as the Acadia Professor of Psychiatric and Mental Health Nursing. (Cutcliffe Declaration at 1, ECF No. 14-1.)  He was also the sole proprietor of a healthcare and education consulting business called Cutcliffe Consulting. (Cutcliffe Declaration at 1.)  He has held several positions as adjunct professor or visiting professor at various universities, including one such unpaid position at the University since 2006. (Cutcliffe Declaration at 2.)   Some of Cutcliffe's academic connections with faculty at the University date as far back as 1995, and in 2000-2001, he was employed at the University. (Cutcliffe Declaration at 2.)

In either 2008 or 2009, Cutcliffe initiated a collaboration with the University that lasted several years, involving a plan to develop, implement, and operate a blended distance-learning and traditional clinic-based associate degree program for psychiatric nursing students in the province of Alberta, Canada. (Complaint at 2; Cutcliffe Declaration at 4, 6; Third Cutcliffe Declaration at 1, ECF No. 23-1.)  Cutcliffe provided the University with his intellectual property, including the concept and a comprehensive program proposal that included a complete

3

curriculum, admission requirements, and evaluation methods.  (Complaint at 2.)  The on-going

collaboration expanded upon Cutcliffe's intellectual property and is a derivative work.

(Complaint at 3.)  Cutcliffe also submitted a revised program proposal tailored to the Alberta

implementation of the program, and he provided regulatory expertise.  (Complaint at 2.)

    The proposed curriculum was approved by the relevant academic authority in Alberta.

(Cutcliffe Declaration at 8.)  However, the University did not give approval for the overall

program because the evaluation panel "was not satisfied with the delivery model and remained

unconvinced by the assurances given by the Team."  (Cutcliffe Declaration at 12.)  Cutcliffe

asserts that although the program was never implemented, it was created, and the University has

not compensated him for either his administrative expenses or the use of his intellectual property.

(Complaint at 3; Surreply, at 5, ECF No. 22.)   He alleges that the University continues to use his

intellectual property without his permission.  (Complaint at 4.)

    The parties never entered into a written contract; Cutcliffe's breach of contract claims are

based on an alleged oral contract arising from the parties' communications during the

collaboration.  (Complaint at 4-5.)  However, the parties did create a letter of intent (ECF No.

11-2) and later a memorandum of understanding (ECF No. 11-6).  (Complaint at 2.)  Cutcliffe

alleges that these documents provided "a template" for the oral contract that arose as a result of

the parties' mutual conduct.  (Complaint at 2.)  Cutcliffe alleges that the parties agreed that he

was to be the exclusive owner of the intellectual property, and he would be compensated for the

use of the intellectual property during the development phase of the collaboration as well as for

his administrative expenses during the development phase.  (Complaint at 3.)  However, nothing

in either the letter of intent or the memorandum of understanding supports those allegations.

(Complaint at 2; Letter of Intent; Memorandum of Understanding.)  Cutcliffe states that the

parties "did not expressly discuss how payment would be made" to him, "or where payment

would be made." (Fourth Cutcliffe Declaration at 3-4, ECF No. 26-1.)

According to the letter of intent, the parties to it were the University, Cutcliffe

Consulting, and a wholly-owned subsidiary of the University called UU Health Limited. (Letter

of Intent at 2.) The letter of intent states: "This Letter of Intent is an expression of the goodwill

of all parties to work together in a collaborative partnership pending the preparation and

ratification of a formal legal agreement and cannot be considered as a legally binding

document." (Letter of Intent at 4.) It also provides: "The roles and responsibility of each party

will be discussed and explicated in full in a contractual agreement complying with UK

legislation." (Letter of Intent at 3.) It states that Cutcliffe Consulting "will collaborate with [UU

Health Limited] in providing the necessary information to allow the approval, by [the

University], of [Cutcliffe Consulting] in a collaborative partnership, including an appraisal of the

financial underpinnings of [Cutcliffe Consulting] to undertake this project." (Letter of Intent at

3.)

The parties to the memorandum of understanding were the University, Cutcliffe

Consulting, and Ulster Educational Partnerships Limited. (Memorandum of Understanding at 2.)

The memorandum of understanding states that it created no legal obligation:

> Nothing in this MoU shall be construed as creating a legal relationship between
> the Parties with the exception only of the provisions in clauses [4, 5, 6 and 7].
> This MoU sets forth the general basis upon which the parties wish to proceed; no
> contract will arise as to the subject matter hereof unless and until an agreement
> regarding each objective is negotiated, approved, executed and delivered by the
> parties.

(Memorandum of Understanding at 2.) The referenced clauses provide as follows: Clause 4

provides that each party bears its own costs, stating that "[t]he parties agree that each shall bear

its own costs for any work under this MoU save and except as otherwise agreed in writing

between the parties as detailed in Appendix IV." (Memorandum of Understanding at 7.) Appendix IV of the memorandum of understanding is a spreadsheet (Spreadsheet, ECF No. 23-3) of estimated income and expenses over eleven years, including one pre-program year and the projected first ten program years. Cutcliffe states that it is a true and accurate copy of the estimated income and expenditures "to be realized from the implementation" of the program. (Third Cutcliffe Declaration at 3.)

There is some text included at the bottom of the Appendix IV spreadsheet, but this does not appear to address the allocation of expenditures; rather, it reiterates that the parties will use a fee-splitting arrangement for revenues, the Ulster Educational Partnerships Limited "will be responsible for monitoring and effecting all expenditure pertaining to the programme," and Cutcliffe "will invoice [Ulster Educational Partnerships, Limited] on a quarterly basis and all payments will require to be evidenced." (Spreadsheet at 2.) Clause 4 of the memorandum of understanding states that the parties agree that the costs as stated are a reasonable estimate of the total costs and "[a]fter agreement by both parties and identified upfront operational costs are deducted, the remaining undergraduate fees are to be divided and paid annually to the parties on a 50/50 basis, and there are no other fees or costs to be due or payable hereunder." (Memorandum of Understanding at 7.)

Clause 5 of the memorandum of understanding concerns confidentiality and is not at issue here. (Memorandum of Understanding at 7.)

Clause 6 provides, among other things, that "[t]he agreement will be structured in accordance with the laws of the United Kingdom," with "non-exclusive jurisdiction of the English Courts." (Memorandum of Understanding at 7.) Clause 6 also provides that prior to the confirmation of the memorandum of understanding, Cutcliffe Consulting "will be required to

produce a Bank guarantee of $100,000 payable to [Ulster Educational Partnerships Limited] if,

due to unforeseen circumstances, [Cutcliffe Consulting] is unable to [fulfill] his role and

responsibilities as outlined in this MoU and the subsequent definitive agreement."

(Memorandum of Understanding at 7-8.)

Clause 7 states: "Intellectual property owned by each party on the commencement of this

MoU will remain the property of that party."  (Memorandum of Understanding at 8.)

In addition to these clauses, the memorandum of understanding contains a clause

pertaining to termination, but it does not appear to address the allocation of costs in the event of

termination.  (Memorandum of Understanding at 8.)

**B.  Facts Relevant to Minimum Contacts Analysis**

Cutcliffe initiated the collaborative work at issue in this case while he was living in

Texas.  (Cutcliffe Declaration at 6-7.)  He asserts, however, that for purposes of analysis of

personal jurisdiction under Maine's long-arm statute, "[a]ll of the relevant events underlying the

issues raised in the Complaint took place in Maine."  (Opposition to Motion at 3, ECF No. 14.)

He alleges that he moved from Texas to Maine in January 2010.  (Cutcliffe Declaration at 2.)

The subsequent contacts between Cutcliffe and the University included multiple work product

drafts emailed back and forth between the parties as well as phone calls and teleconferences.

(Cutcliffe Declaration at 6-8.)  By May 2011, the work product was a 195-page proposal

document.  (Cutcliffe Declaration at 8.)

Cutcliffe's contacts with the University since January 2010 have focused on matters both

relating to the work at issue in this litigation (Cutcliffe Declaration at 6-9) and unrelated to this

litigation (Cutcliffe Declaration at 5-6).  The topics that were unrelated to this litigation include

7

research collaborations, review of scholarly papers, and bringing a doctoral student to the University.  (Cutcliffe Declaration at 5-6.)

The parties dispute whether the University knew that Cutcliffe had moved his consulting business to Maine while he was engaged in work with the University.  (Opposition to Motion at 3; Reply at 1-2, ECF No. 17.)  Cutcliffe alleges that the University, through two University professors, knew about his move to Maine and was aware that he was performing work in Maine. (Cutcliffe Declaration at 3-5.)  Many of his emails to the University contained his title, "Acadia Professor of Psychiatric and Mental Health Nursing, University of Maine," in the signature block of the email or otherwise included title or reference matter identifying him as a University of Maine professor or listing his home address in Maine.  (Cutcliffe Declaration at 8-9.)  Cutcliffe also asserts that a factual dispute exists over whether he misrepresented to the University that he operated his business as anything other than a sole proprietorship, although he argues that this dispute is irrelevant for purposes of personal jurisdiction.  (Opposition to Motion at 3.)

## II.       Discussion

### A.  Foreign Sovereign Immunities Act

The University argues that it is an agency or instrumentality of the United Kingdom, it was engaged in non-commercial activity with Cutcliffe, and its activity otherwise does not come within the commercial-activity exception to sovereign immunity under the FSIA.  (University's FSIA Brief at 3-9.)  Cutcliffe argues that the University does not meet the requirements to be considered an agency or instrumentality of a foreign state, and even if it did meet those requirements, the activities that form the basis for this lawsuit fall within the commercial-activity exception to immunity under the FSIA.  (Cutcliffe's FSIA Brief at 2-9, ECF No. 23.)

### 1. Overview of the statute and the parties' burdens

The FSIA "'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'"  Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)).  The FSIA governs both subject matter jurisdiction and personal jurisdiction over foreign states.  See Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 485 n.5 (1983) (noting that "both statutory subject matter jurisdiction (otherwise known as 'competence') and personal jurisdiction turn on application of the substantive provisions of the [FSIA]"); Frontera Resources Azerbaijan, 582 F.3d at 400 (holding that foreign states and their agencies are not "entitled to the jurisdictional protections of the Due Process Clause" of the 5th Amendment to the United States Constitution).

The FSIA provides immunity to foreign states and their "agencies and instrumentalities." 28 U.S.C. §§ 1603, 1604.  Section 1604 provides: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in section 1605 to 1607 of this chapter."  The statute defines "foreign state" to include an "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Subsection 1603(b) provides:

> An "agency or instrumentality of a foreign state means any entity—
>
> > (1) which is a separate legal person, corporate or otherwise, and
> >
> > (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> >
> > (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

The legislative history of the FSIA states:

> As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign state could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.

H.R. Rep. No. 94-1487, 1976 WL 14078, at *15-16, reprinted in 1976 U.S.C.C.A.N. 6604, 6614.

Title 28 U.S.C. § 1605 provides certain exceptions to immunity, including one for commercial activity:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> . . .
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Subsection 1603(d) defines "commercial activity" as meaning "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  The Supreme Court has held:

> [T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce."

Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992) (emphasis in original) (quoting Black's Law Dictionary 270 (6th ed. 1990)).  The Supreme Court acknowledged "the difficulty of distinguishing 'purpose' (i.e., the reason why the foreign state engages in the

activity) from 'nature' (i.e., the outward form of the conduct that the foreign state performs or

agrees to perform), but recognized that the [FSIA] 'unmistakably commands' us to observe the

distinction." Nelson, 507 U.S. at 361 (emphasis in original) (quoting Weltover, 504 U.S. at 617)

(quotation marks omitted).

> If the Court determines that the University is an agency or instrumentality of a foreign

state, but that the actions at issue come within the commercial-activity exception to immunity,

the Court has personal jurisdiction.  See 28 U.S.C. §1330(a).  Subsection 1330(a) provides:

> The district courts shall have original jurisdiction without regard to amount in
> controversy of any nonjury civil action against a foreign state as defined in
> section 1603(a) of this title as to any claim for relief in personam with respect to
> which the foreign state is not entitled to immunity either under sections 1605-
> 1607 of this title or under any applicable international agreement.

> It appears that the First Circuit has not yet addressed the respective burdens of the parties

under the FSIA, but almost every other circuit has done so.  Universal Trading & Inv. Co., Inc.,

v. Bureau for Representing Ukrainian Interests in Int'l and Foreign Courts, 2012 WL 4324062, at

*6, 2012 U.S. Dist. Lexis 133736, at *15 (D. Mass. Sept. 19, 2012) (collecting cases).  Other

circuits apply a burden-shifting framework under which "'the defendant must present a prima

facie case that it is a foreign sovereign'; the plaintiffs then have the 'burden of production' of

offering 'evidence showing that, under exceptions to the FSIA, immunity should not be granted';

and finally, 'the ultimate burden of persuasion remains with the alleged foreign sovereign' to

show that none of the pertinent exceptions applies." Id. (emphasis in original) (quoting Virtual

Countries, Inc., v. Republic of S. Africa, 300 F.3d 230, 241 (2d Cir. 2002)).

> In a motion to dismiss a claim based on sovereign immunity under the FSIA, a defendant

"may challenge either the legal sufficiency or the factual underpinning" of one of the statutory

exceptions to immunity.  Phoenix Consulting, 216 F.3d at 40.  "If the defendant challenges only

11

the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true . . . ."  Id.  However, if the defendant challenges the plaintiff's allegations of jurisdictional facts, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  Id.; see also Robinson, 269 F.3d at 141.

   2.   **The agency-or-instrumentality requirement**

   The First Circuit has addressed what constitutes a "foreign state" under the FSIA, see Ungar v. Palestine Liberation Organization, 402 F.3d 274, 282-83 (1st Cir. 2005), but it has not had occasion to decide whether a foreign entity is an agency or instrumentality of a foreign state under the FSIA, pursuant to 28 U.S.C. § 1603.  Some courts have identified the following as the factors to consider:

   > "(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the foreign country; and (5) how the entity is treated under foreign state law."

Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd., 476 F.3d 140, 143 (2d Cir. 2007) (alteration omitted) (quoting Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004)); Supra Med. Corp. v. McGonigle, 955 F.Supp. 374, 379 (E.D. Pa. 1997) (citing Corporacion Mexicana de Servicios Maritimos, S.A. v. M/T Respect, 89 F.3d 650, 654-55 (9th Cir. 1996)). The five-factor approach has been criticized as "inadequate": "Various courts have used this test and its factors with little question or investigation into their provenance."  Michael A. Granne, Defining "Organ of a Foreign State" Under the Foreign Sovereign Immunities Act of 1976, 42 U.C. Davis L. Rev. 1, 22-23 (2008).

In <u>Supra Medical</u>, the court held that a British medical school and dental school were not organs of the British government.  955 F. Supp. at 379.  The court concluded that it was insufficient that the schools were established by an act of Parliament, seventy percent of their funding was public, and they were required to account to the government for their funding.  <u>Id.</u> The court found that there was no particular national or governmental purpose served by the schools' educational and research goals, and the schools were not the only source of medical and dental education in the United Kingdom.  <u>Id.</u>   The court noted that British law apparently treated the schools as separate and independent from the government on the basis that they are separate legal entities that can sue and be sued in their own name.  <u>Id.</u>  The schools' Council of Governors was selected by private individuals within the schools and had responsibility for the schools' debts, contractual obligations, and lawsuits.  <u>Id.</u>  On these facts, the court held that the schools had failed to meet their burden of making a prima facie showing that they were agencies or instrumentalities of a foreign state, and they were therefore not entitled to immunity under the FSIA.  <u>Id.</u>   Similarly, in <u>Santilli v. Cardone</u>, No. 8:07-cv-308-T-23MSS, 2008 WL 2790242, at *1-2, 2008 U.S. Dist. Lexis 111677, at *4-6 (M.D. Fla. July 18, 2008), the court held that the University of Aquila was not an organ of the Italian government because the university supplied no evidence that it served a national purpose, that the Italian government actively supervised it or required it to hire public employees, that it held exclusive rights, or that Italian law treated it as dependent upon the government.

In contrast to <u>Supra Medical</u> and <u>Santilli</u>, the court in <u>Intercontinental Dictionary Series v. DeGruyter</u> concluded that the Australian National University was an agency or instrumentality of the Australian government.  <u>Intercontinental Dictionary Series v. de Gruyter</u>, 822 F. Supp. 662, 672-73 (C.D. Cal. 1993), <u>overruled on other grounds by</u> <u>Sun v. Taiwan</u>, 201 F.3d 1105 (9th

Cir. 2000).[3]  The facts important to the court in <u>Intercontinental Dictionary</u> were that the university was a separate legal entity, it was formed by the government "to further academic interests of national importance," employees' salaries were paid by the Australian government, the university was required to submit reports to the government and received government funding, and the university was treated as an agency of the government in other legislation.  <u>Id.</u> at 673.  In <u>Intercontinental Dictionary</u>, the court also reasoned that "[t]he factors determinative of 11th Amendment immunity are analogous to those for determining 'agency or instrumentality' status under the FSIA."  <u>Id.</u> at 674.   Without specifying in <u>Intercontinental Dictionary</u> what those factors were, the court noted that they supported its conclusion that the Australian National University was an agency or instrumentality of the Australian government.  <u>Id.</u>

      Although the First Circuit has not had occasion to construe section 1603 concerning a foreign agency or instrumentality or address the 11th Amendment analogy, it has addressed the issue of a public university's immunity under the 11th Amendment in a non-FSIA case.  A detailed discussion of this analogy seems a worthwhile diversion.  In <u>Irizarry-Mora v. Univ. of Puerto Rico</u>, 647 F.3d 9 (1st Cir. 2011), the Court noted that the 11th Amendment is concerned with "the States' dignity and their financial solvency."  <u>Id.</u> at 12.   The Court reaffirmed that it uses a two-part inquiry, drawn from <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30 (1994), in which

> "a court must first determine whether the state has indicated an intention—either explicitly by statute or implicitly through the structure of the entity—that the entity share the state's sovereign immunity. If no explicit indication exists, the court must consider the structural indicators of the state's intention. If these point

---

[3]     The Ninth Circuit, in <u>Sun v. Taiwan</u>, 201 F.3d 1105 (9th Cir. 2000), overruled the part of the court's holding in <u>Intercontinental Dictionary</u> in which the court had concluded that the compilation of a linguistic treatise was non-commercial activity; the Ninth Circuit stated  that "[c]ompiling academic treatises is the kind of activity that private publishers do perform."  <u>Sun</u>, 201 F.3d at 1108-09.   <u>Sun</u> did not overrule the portion of <u>Intercontinental Dictionary</u> in which the court concluded that the Australian National University was an organ of the government. <u>Sun</u>, 201 F.3d at 1108-09.

in different directions, the court must proceed to the second stage and consider whether the state's treasury would be at risk in the event of an adverse judgment."

Irizarry-Mora, 647 F.3d at 12 (quoting Redondo Constr. Corp. v. P.R. Highway & Transp. Auth., 357 F.3d 124, 126 (1st Cir. 2004)) (citation omitted).  The First Circuit noted that "'when there is ambiguity from the structure about whether an entity is an arm of the state, the primary focus is on the risk to the state treasury.'"  Id. at 13 (quoting Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 66 (1st Cir. 2003)).

In Irizarry-Mora, the First Circuit applied this analysis to the issue whether the University of Puerto Rico was an "arm of the state" for purposes of 11th Amendment sovereign immunity status.  Id. at 10, 14.  The Court noted that although each university must be analyzed individually for its unique characteristics, "[t]he distinctive, public-oriented role that a state university typically plays in its state's higher education landscape undoubtedly accounts for the fact that the vast majority of state universities have been found to be arms of the State."  Id. at 14 (alteration and quotation marks omitted).  The following were factors weighing in favor of the Court's conclusion: (1) the public role of the university; (2) its achievement of a public purpose; (3) the restrictions on the university's authority to increase fees to raise revenue in comparison with a private university and the relationship between this restriction and the university's statutory educational mission, particularly for persons of low income; (4) the structure of the university's governing board, of which ten of thirteen members are appointed by the governor with the advice and consent of the Puerto Rico Senate; (5) the significant role that the board plays in governing the university; (6) the requirement that the board approve the university's annual budget and report board activities and the university's finances to the governor.  Id. at 14-15.

The Court noted in <u>Irizarry-Mora</u> that the university "also possesses attributes of an autonomous agency." <u>Id.</u> at 15.  Under 11th Amendment analysis, this weighs against a finding that an entity is an arm of the state, <u>id.</u> at 16, but under subsection 1603(b)(1) of the FSIA, the foreign entity is actually required to be legally separate from a foreign state in order to establish itself as an agency or instrumentality of the foreign state.  Thus, the distinction between 11th Amendment analysis and the FSIA does not weaken the analogy between the FSIA and the 11th Amendment, but rather simply removes the issue of separate legal status from the analysis whether the entity is "an organ of a foreign state," pursuant to subsection 1603(b)(2).

It was the second part of the 11th Amendment analysis that ultimately persuaded the First Circuit that the University of Puerto Rico must be granted immunity.  <u>Irizarry-Mora</u>, 647 F.3d at 17.  The Court noted that over sixty percent of the university's funding came from the government, and stated: "Because providing affordable higher education for Puerto Rico residents is the Commonwealth's goal, the Commonwealth must as a practical matter ensure the University's financial viability—regardless of its responsibility for particular University debts." <u>Id.</u> at 16-17.  Based on the Court's conclusion that Commonwealth funds were put at risk when university funds were at risk, it held that the university was an arm of the government, for purposes of the 11th Amendment, and that the university shared the sovereign immunity of the Commonwealth of Puerto Rico.  <u>Id.</u> at 17.

Turning from the 11th Amendment analogy to the application of the FSIA in this case and the question whether the University is an agency or instrumentality of a foreign state, I start with a few preliminary points.  Cutcliffe has no issue with the University's showing under either subsection 1603(b)(1), which requires the entity to be a separate legal entity, or subsection 1603(b)(3), which requires that the entity not be a citizen of the United States or created under

16

the laws of a third country.  (Cutcliffe's FSIA Brief at 2-5.)  I therefore conclude that the

University has met its requirement to produce prima facie evidence sufficient to meet the

requirements of subsections 1603(b)(1) and (3).  The parties' dispute focuses on the requirement

in subsection 1603(b)(2) that the entity produce prima facie evidence that it is an "organ" of a

foreign state.  (University's FSIA Brief at 3.)  I do not address the alternative basis for immunity

set forth in subsection 1603(b)(2), which is that the foreign state owns a majority of shares or

other ownership interest in the entity, because the University has not asserted that it is entitled to

immunity on that basis.  (University's FSIA Brief at 3-5.)

      The University's argument that it is an organ of the United Kingdom addresses three of

the five factors that were identified in <u>Penninsula Asset Management</u>, 476 F.3d at 143, and

applied in <u>Supra Medical</u>, 955 F. Supp. at 379.  The University argues that (1) it has a national

purpose, which is education; (2) it is actively supervised by the government because it is required

to submit annual financial reports to the government; and (3) it has the exclusive right to confer

university-level degrees in certain academic programs.  In addition, the University points out that

seventy-five percent of its "direct funding" comes from the government.  (University's FSIA

Brief at 4-5.)

      I conclude that the University is an "organ" of a foreign state, pursuant to subsection

1603(b)(2), and consequently that it is an "agency or instrumentality of a foreign government,"

pursuant to 28 U.S.C. § 1603(b).  I conclude that because the University was founded as a

charity to advance education and the vast majority of its funding is public, the University serves

a national purpose of advancing education.  The University has a public role, public mission, and

public funding.  I see no reason for treating the University differently under the FSIA foreign-

state analysis than the First Circuit treated the University of Puerto Rico under 11th Amendment

arm-of-the-state analysis. See Irizarry-Mora, 647 F.3d at 12.[4]

### 3.   The commercial-activity exception to immunity

If the Court decides that the University is an organ of a foreign state and should be

considered an "agency or instrumentality of a foreign state," pursuant to 28 U.S.C. § 1603(b), the

next question is whether the commercial-activity exception applies, pursuant to section 1605.

Cutcliffe argues that the exception applies because the activities at issue here are characteristic of

businesses acting in the marketplace rather than sovereign governments, and both Cutcliffe and

the University performed contractual obligations in the United States.  (Cutcliffe's FSIA Brief at

7-9; Cutcliffe's FSIA Response at 2-3.)

The University argues that the commercial-activity exception does not apply because

developing an academic program implicates the power bestowed upon the University by the

sovereign state.  (University's FSIA Brief at 5-6.)  Furthermore, the University argues, the locus

requirements of 28 U.S.C. § 1605(a)(2) have not been met because the commercial activity

and/or acts related to that activity did not occur in the United States, nor was any "direct effect"

of the activity caused in the United States, as the statute requires.  (University's FSIA Brief at 6-

9; University's FSIA Response at 3-5.)

In a landlord-tenant litigation involving Costa Rican diplomats in Puerto Rico, the First

Circuit noted:

> In order to qualify for the commercial activity exception, an action must be
> "based upon" commercial activity by the defendant foreign state.  28 U.S.C. §

---

[4]      Cutcliffe's late-filed "additional attachment" (Attachment, ECF No. 28) does not affect my analysis.  That
document is entitled "The Industrial Tribunals" and appears to contain statements regarding whether another
university—the University of Glasgow—was considered "an organ of the State" in the matter before the tribunal.
(Attachment at 2.)  Although the Court may recognize a foreign judgment, see Sangiovanni Hernandez v.
Dominicana de Aviacion, C. Por A., 556 F.2d 611, 614 (1st Cir. 1977),  here Cutcliffe did not supply information to
explain whether the additional attachment is a foreign judgment that should be recognized as such.

> 1605(a)(2).  The Supreme Court has explained that a claim is "based" on "those
> elements . . . that, if proven, would entitle [the] plaintiff to relief under his theory
> of the case."

Fagot Rodriguez v. Republic of Costa Rica, 297 F.3d 1, 6 (1st Cir. 2002) (quoting Nelson, 507

U.S. at 357).  Because the plaintiff has the burden to produce evidence that the commercial-

activity exception applies, it is Cutcliffe's burden to meet these requirements with prima facie

evidence.  See Universal Trading, 2012 WL 4324062, at *6, 2012 U.S. Dist. Lexis 133736, at

*15.

The activity at issue here is of the type that falls within the commercial-activity

exception.  As Cutcliffe points out, he has engaged in similar collaborative activity with a private

educational institution.  (Third Cutcliffe Declaration at 2.)  Collaboration of the type at issue

here, on a project to plan and offer an academic program, is an activity that can certainly be

carried out by private parties in the marketplace; it is not of necessity a governmental activity.

However, although the activity is commercial, I recommend that the Court determine that

Cutcliffe has not met his burden under 28 U.S.C. § 1605(a)(2), because he has not alleged facts

that support the locus requirements for jurisdiction under the commercial exception.

Addressing first Cutcliffe's claims for breach of an oral contract, he could have two

possible theories of the case concerning those claims, although neither of these ultimately

advances his argument that commercial activity or an act performed in connection with it

occurred in the United States.  One theory involves a claim of an anticipatory breach of

payments that would have been due under the original plan, i.e., once the program was under

way and generated revenue.  An "anticipatory breach" is "[a] breach of contract caused by a

party's anticipatory repudiation, i.e., unequivocally indicating that the party will not perform

when performance is due."  Blacks Law Dictionary 213 (9th ed. 2009).

19

A claim of anticipatory breach of contract does not satisfy the "direct effect" requirement of 28 U.S.C. § 1602(a)(2) when there was no contract provision directing payment to a specific place in the United States.  The Second Circuit has held that in cases involving claims of anticipatory repudiation, an act outside the United States in connection with commercial activity outside the United States has no "direct effect in the United States," as required pursuant to 28 U.S.C. § 1602(a)(2), unless the contract specifically requires performance in the United States:

> Every circuit court of which we are aware that has addressed this issue has held—without reference to whether the plaintiff was a corporation, a non-corporate business entity, or a natural person—that an anticipatory contractual breach occurs "in the United States" for the jurisdictional purposes of § 1605(a)(2) if performance could have been required in the United States and then was requested there.

Virtual Countries, 300 F.3d at 239 (collecting cases).  In several of the cases cited in Virtual Countries, the jurisdictional predicate for the commercial-activity exception was met because the defendants had agreed to make payment by depositing money into an account in a specified bank in the United States, or performance was otherwise designated to take place in a specific state in the United States.  Id. at 239-240 (citing, inter alia, Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 818 (6th Cir. 2000)) (noting that the contract provided that payment was to be deposited into a Cleveland bank), overruled on other grounds, Samantar v. Yousuf, 130 S. Ct. 2278, 2289 (2010).  In other cases cited in Virtual Countries, the jurisdictional predicate was not met because no United States location had been designated as the place of performance.  Id. (citing United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n, 33 F.3d 1232, 1238 (10th Cir. 1994); Dar El-Bina Eng'g & Const. Co. v. Republic of Iraq, 79 F. Supp. 2d 374, 382-85 (S.D. N.Y. 2000)).

Cutcliffe admits that the fee-splitting arrangement did not specify where payment would be made.  (Cutcliffe's FSIA Response at 3; Fourth Cutcliffe Declaration at 3-4.)  He alleges no

other facts indicating that the parties had decided on payment to a particular account in the United States.  On that basis, he has not met the "direct effect" jurisdictional prerequisite.

The other possible theory of the case is that the parties' oral contract concerned only the development phase of the program, and as to that contract, Cutcliffe has already either fully or substantially performed the contract, such that payment was due and the contract was already breached.  (Cutcliffe's FSIA Brief at 5-6.)  Under this theory, both parties performed substantial work in Maine, and it was their conduct in performing that work that gave rise to an oral contract under Maine law.  Whereas the anticipatory breach theory failed because Cutcliffe stated that the contract provided no indication of the locus of the breach, this theory of necessity focuses on the locus of the formation of the contract rather than the breach, and jurisdiction fails unless Maine law would recognize the formation of a contract under the facts as presented by Cutcliffe. Whereas the locus requirement under the anticipatory breach theory focused on whether Cutcliffe suffered a "direct effect" of the breach in the United States, the locus requirement for jurisdiction under the contract-formation theory of the case focuses "upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."  28 U.S.C. § 1605(a)(2).  Although the FSIA permits the Court to focus on activity anywhere in the United States, the jurisdictional focus must remain on the University's Maine connections because Cutcliffe's theory is that it was the parties' conduct in Maine that gave rise to a contract under Maine law.  See Nelson, 507 U.S. at 357 (noting that conduct is "based upon" commercial activity or an act in connection with commercial activity, within the meaning of 28 U.S.C. § 1605(a)(2), if it is based upon "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case"); Fagot Rodriguez, 297 F.3d at 6.

21

In order to resolve the issue of jurisdiction under the FSIA, it is necessary to take two steps backward, to choice-of-law rules, and then advance to the application of Maine law of contract formation only if Maine choice-of-law rules permit.  This is apparently not unusual; the Second Circuit has noted that courts are "regularly called upon to inquire into substantive state or federal law to resolve the threshold question of subject matter jurisdiction under the FSIA." Robinson, 269 F.3d at 143.  Assuming that the jurisdictional conduct took place in Maine as Cutcliffe asserts, and assuming that Maine law applies to resolve threshold choice-of-law issues, Maine follows a standard in both tort and contract cases under which "[t]he state that has the more significant contacts and the more substantial relationships to the occurrence and the parties should enjoy the application of its laws."  Adams v. Rubin, 964 F. Supp. 507, 509 (D. Me. 1997) (tort case); see also Flaherty v. Allstate Ins. Co., 2003 ME 72, ¶ 16, 822 A.2d 1159 (contract case).

Here, Maine does not have the most significant contacts to this transaction; it is involved only because Cutcliffe moved to Maine part way through the collaboration.  The collaboration itself, the program, and payment have nothing to do with Maine.  It would be inappropriate to focus myopically, for purposes of determining jurisdiction, on the fact that some communications went into and out of Maine when the Maine connection to the activity is only fortuitous.  Cutcliffe's contract claims do not get beyond Maine's choice-of-law rules, and I do not apply Maine law to the contract-formation element of his claims.  This is not to say that the FSIA requires that all the elements of the cause of action occur in the United States, because it does not contain any such requirement.  See Nelson, 507 U.S. at 358-59; Intel Corp. v. Commonwealth Scientific and Indus. Research Org., 455 F.3d 1364, 1370-71 (Fed. Cir. 2006). The statute provides that jurisdiction under the commercial-activity exception may be based

upon "*an act* performed in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added).  The problem for Cutcliffe is not that there was an insufficient number of acts that took place in Maine or in the United States.  Rather, it is that the nature of those contacts, viewed under Maine choice-of-law rules, does not support the application of Maine contract law to this case.  Without the application of Maine contract law, Cutcliffe's submissions have put forth no contract claim at all.

I also conclude that jurisdiction is lacking on Cutcliffe's remaining claims.  The claims for quantum meruit and unjust enrichment suffer the same fate as the contract claims.  If the outcome were otherwise on those claims, Cutcliffe would gain more of a jurisdictional foothold in the absence of a contract than he would if he had had one.  The other remaining claims are for conversion, misappropriation of intellectual property, negligent misrepresentation, and deceptive trade practices under 10 M.R.S. §§ 1211-1216.  These claims all relate to alleged intellectual property misdeeds as to which Cutcliffe must demonstrate he has suffered a "direct effect" in the United States, pursuant to 28 U.S.C. § 1605(a)(2).  Cutcliffe claims that he lost business opportunities because the University negligently misrepresented that the relationship between them would be exclusive.  (Cutcliffe's FSIA Response at 2; Fourth Cutcliffe Declaration at 2.) The allegation of lost business necessitates a "long chain of causation" that as a matter of law cannot be considered a "direct effect" sufficient to establish jurisdiction.  Virtual Countries, 300 F.3d at 238.  "If a loss to an American individual and firm from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states because contractual breaches would be pleaded as torts of conversion or fraud."  Id. at 240 (quotation marks and

alterations omitted).  Cutcliffe's allegations and prima facie evidence do not meet the jurisdictional prerequisites for the commercial-activity exception to the FSIA.

### B.  Minimum Contacts

If the Court determines that the FSIA does not apply because the University is not an agency or instrumentality of a foreign state, the Court must consider whether the University is otherwise subject to personal jurisdiction.  The University argues that its Maine contacts with Cutcliffe were insufficient for the Court to exercise either general or specific personal jurisdiction over it.  It argues that general jurisdiction is lacking because its Maine contacts were not continuous and systematic.  (Motion at 8-9.)  It argues that specific jurisdiction is lacking, essentially because Cutcliffe initiated the discussions from his then-home in Texas, and any subsequent contacts with Maine after he moved here were incidental and fortuitous, as to the contract claims, and not a legal or factual cause of any injury, as to the tort claims.  (Motion at 12-13.)  The University argues that it did not purposefully avail itself of the Maine forum (Motion at 13-15), and it would be unreasonable for the Court to exercise personal jurisdiction over the University (Motion at 15-16).

Cutcliffe argues that general jurisdiction exists based on his Maine contacts with the University concerning projects other than the one at issue in this litigation.  (Opposition at 13.)  He argues that specific jurisdiction exists because the parties communicated with each other over a long period, exchanging substantial amounts of work product that amounted to substantial performance, thereby meeting the requirements that the claim be related to the University's acts in Maine and that the University availed itself of the Maine forum.  (Opposition at 14-17.)  He also argues that the third requirement for specific jurisdiction—that it is reasonable to require the University to defend itself in Maine—has been met.  (Opposition at 17-20.)

24

Despite the parties' dispute of fact over whether the University knew that Cutcliffe was operating his business in Maine from January 2010 forward, neither party has requested an evidentiary hearing to resolve it, and I have chosen to evaluate the personal jurisdiction issues presented using the prima facie method.  See id. (citing Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145-47 (1st Cir. 1995)).  Under that standard, I "consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction."  Foster-Miller, 46 F.3d at 145 (quotation marks omitted).  "The facts put forward by the defendant become part of the mix only to the extent that they are uncontradicted."  Astro-Med, Inc., v. Nihon Kohden Am., Inc., 591 F.3d 1, 8 (1st Cir. 2009) (quotation marks omitted).

"To hear a case, a court must have personal jurisdiction over the parties, that is, the power to require the parties to obey its decrees."  Id. (quotation marks omitted).  Cutcliffe asserts jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332(a)(2).  Personal jurisdiction in a diversity case is evaluated under the law of the forum state.  "In assessing personal jurisdiction over a non-resident defendant, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state."  Astro-Med., 591 F.3d at 8 (quotation marks omitted).  Cutcliffe has the burden of demonstrating that Maine's long-arm statute "grants jurisdiction and that the exercise of jurisdiction under the statute is consistent with the Due Process Clause of the United States Constitution."  See id.  The relevant portions of Maine's long-arm statute state:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated in this section, thereby submits such person, and, if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

> A.  The transaction of any business within this State;
>
> B.  Doing or causing a tortious act to be done, or causing the consequences of a tortious act to occur within this State;
>
> . . . .
>
> I.  Maintain any other relation to the State or to persons or property which affords a basis for the exercise of jurisdiction by the courts of this State consistent with the Constitution of the United States.

14 M.R.S. § 704-A.  Because Maine's statute is co-extensive with the due process clause of the United States Constitution, the due process inquiry controls.  See Astro-Med., 591 F.3d at 8-9; Angela Adams Licensing, LLC, v. Dynamic Rugs, Inc., 463 F. Supp. 2d 82, 83-84 (D. Me. 2006).  Due process requires that the defendant have "certain minimum contacts" with the jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

There are two types of jurisdictional analysis that courts use: general jurisdiction and specific jurisdiction.  Astro-Med., 591 F.3d at 9.  A court has general jurisdiction over a defendant "when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state."  United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant Street Corp., 960 F.2d 1080, 1088 (1st Cir. 1992).  I simply do not accept that the University's Maine-based contacts, which all related to its relationship with Cutcliffe and his academic collaborations with the University, amounted to continuous and systemic activity in Maine, unrelated to this lawsuit.  Cutcliffe argues that his review of scholarly articles and his other connections with the University, some of which involve a third-party doctoral student, give rise to general jurisdiction.  An academic relationship with a professor who relocated to Maine, even

26

when that relationship is ongoing on various fronts, is an insufficient basis for the exercise of general jurisdiction over the University.  See Harlow v. Children's Hosp., 432 F.3d 50, 65-66 (1st Cir. 2005) (holding that a Massachusetts hospital's treatment of patients from Maine on a regular basis, when it derived less than 1% of its total revenue from that treatment, and its occasional mailings to pediatricians in Maine, did not constitute continuous and systematic activity sufficient to exercise general jurisdiction in Maine over the hospital).

In this litigation, Cutcliffe's claims are founded directly upon the University's forum-based contacts.  A court has "specific jurisdiction" over a defendant when "the cause of action arises directly out of, or relates to, the defendant's forum-based contacts."  Id. at 1088-89.  The First Circuit analyzes whether the defendant has the requisite minimum contacts with the jurisdiction through three inquiries.  Astro-Med., 591 F.3d at 9.  First, the Court considers "whether 'the claim underlying the litigation directly arises out of, or relates to, the defendant's forum-state activities.'"  Id. at 9 (alterations omitted) (quoting N. Laminate Sales, Inc., v. Davis, 403 F.3d 14, 25 (1st Cir. 2005)).  The "relatedness test" is a "'flexible, relaxed standard.'"  Id. (quoting N. Laminate Sales, 403 F.3d at 25).  As to contract claims, the requirement is met "where the defendants' forum-based activities are 'instrumental either in the formation of the contract or in its breach.'"  New Life Brokerage Servs., Inc. v. Cal-Surance  Assocs., Inc., 222 F. Supp. 2d 94, 102 (D. Me. 2002) (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999)).   As to tort claims, the inquiry focuses on "the causal nexus between the defendant's contacts and the plaintiff's cause of action."  Astro-Med., 591 F.3d at 9 (quoting Phillips Exeter Acad., 196 F.3d at 289).

Second, "'the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and

protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.'" Id. at 10 (quoting N. Laminate Sales, 403 F.3d at 25). The "'cornerstones upon which the concept of purposeful availment rest[s] are voluntariness and foreseeability.'" Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 61 (1st Cir. 2002) (quoting Sawtelle v. Farrell, 70 F.3d 1381, 1391 (1st Cir. 1995)).

Third, the Court considers whether subjecting the defendant to the court's jurisdiction is reasonable based on several "gestalt factors," including the burden on the defendant, the state's interest in adjudicating the dispute, the plaintiff's interest in obtaining relief conveniently and effectively, the interstate judicial system's interest, and the shared policy interests of the states. Astro-Med., 591 F.3d at 10 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985); N. Laminate Sales, 403 F.3d at 26. "'[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction.'" Harlow, 432 F.3d at 67 (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994)).

Cutcliffe has satisfied the first prong because his claims are related to the University's activities. His contract claim is based on a theory that the mutual conduct of the parties gave rise to an oral contract between them. (Complaint at 3-5.) I conclude that the University's contacts "create a tenuous nexus" between it and Maine, for purposes of the relatedness test, as the Court recognized under comparable facts in Telford Aviation, Inc., v. Raycom National, Inc., 122 F. Supp. 2d 44, 47 (D. Me. 2000). In Telford Aviation, the Court concluded that the out-of-state defendant's failure to deliver payment to Maine, combined with its frequent phone calls and faxes to Maine requesting services of the plaintiff under the parties' contract, satisfied the

requirement that there be a relationship between the cause of action and the forum of Maine.  122 F. Supp. 2d at 47.

However, I conclude that Cutcliffe has not satisfied the second prong of purposeful availment.  The University's contacts with Maine were fortuitous because they were based entirely on Cutcliffe's decision to move to Maine and handle his communications with the University from his Maine residence.  See Burger King, 471 U.S. at 475; Telford Aviation, 122 F. Supp. 2d at 47.  Were it not for Cutcliffe's move to Maine, the University would not have directed any communications to him here.  The University has not purposefully availed itself of the benefits and protections of Maine law through its contacts with Cutcliffe in Maine.  See Telford Aviation, 122 F. Supp. 2d at 47.

Finally, I conclude that Cutcliffe has not satisfied the third prong of demonstrating the reasonableness of asserting personal jurisdiction over the University in Maine.  Cutcliffe's work with the University is a result of a contact he initiated from outside Maine, and the collaboration concerns academic programming in the United Kingdom and Canada, not in Maine.  Cutcliffe admits that many communications were sent from him to the University as well as from the University to him, so I cannot conclude, even on his mutual-conduct contract theory, that Maine is any more reasonable a choice of forum than the United Kingdom or some other location.  Maine would surely be a more convenient forum for Cutcliffe, but it would not necessarily be a more effective forum, given that the University is located in the United Kingdom and choice of law issues would necessarily arise.  Under these circumstances, it would be unreasonable to require the University to defend against Cutcliffe's claims in Maine.  See Burger King, 471 U.S. at 486; Harlow, 432 F.3d at 66-67; Telford Aviation, 122 F. Supp. 2d at 48.

29

### III.    Conclusion

For all of the foregoing reasons, I recommend that the Court GRANT the University's

motion to dismiss and DISMISS all claims without prejudice.


### Notice

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

February 5, 2013                          /s/ Margaret J. Kravchuk
                                          U.S. Magistrate Judge